CHARLES R. FOWLER v. GEORGE W. JENKS and Others.[1]

June 26, 1903.

Nos. 13,358, 13,359—(36, 37).[2]

**Reopening Bankrupt Estate.**

Section 44 of the federal bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 557), provides that in case of a vacancy on the reopening of an estate, or after a discharge is revoked, the creditors of the bankrupt shall make a new appointment, and that, if the creditors do not make such appointment, the court shall do so. *Held*:

(a) The appointment of such trustee upon the reopening of a bankrupt estate, without prior action on the part of the creditors, will not be considered invalid in a collateral action.

[1] Reported in 95 N. W. 887; 96 N. W. 914; 97 N. W. 127.
[2] On reargument Nos. 1, 2, on October, 1903, term calendar

(b) Where such bankrupt estate was reopened for the reason that the bankrupt had fraudulently concealed certain personal property, and had failed to schedule the same, the effect was, so far as the bankrupt and his creditors were concerned, to place the parties in the same relation before the court as they were before the estate was closed and the bankrupt discharged. Title to the concealed and nonscheduled property did not revest in the bankrupt after his discharge, so as to deprive the court of jurisdiction upon the reopening of the estate.

### Fraudulent Concealment of Property.

In an action brought by such trustee to have himself adjudged to be the owner of certain shares of capital stock which had been fraudulently carried in the name of the bankrupt as trustee and in the names of other parties for the purpose of concealing the same, *held* :

(a) The evidence was sufficient to support the finding of the court that all of the stock appearing upon the books of the company in the name of the bankrupt as trustee and in the name of defendant Eldridge was in fact the stock of the bankrupt.

(b) The evidence was not sufficient to justify the court in finding that certain nonresident stockholders held the stock which appeared in their names upon the books of the company for the fraudulent purpose of assisting the bankrupt in concealing and disposing of the same.

### Evidence.

The evidence was not sufficient to justify the court in finding that certain shares of stock belonging to the bankrupt had been fraudulently surrendered to the company, and that the company received the same for the purpose of aiding and assisting the bankrupt in disposing thereof.

### Sale—Evidence.

Whether such company had legally sold and transferred its property to a foreign corporation in consideration that the stock should be surrendered, and that an equivalent amount of stock in the foreign company should be issued in place thereof, was not an issue before the trial court, and the foreign company was not a party to the action ; and the evidence was not sufficient to justify a finding that the company, its officers and stockholders, other than the bankrupt, were guilty of a fraudulent conspiracy to assist the bankrupt in disposing of his stock.

### Conspiracy—Default—Proof.

Certain nonresident creditors were made parties to the action by constructive service of summons, but they made no general appearance, and were in default for want of an answer to the merits, but such default did not excuse the plaintiff from sustaining the charge of conspiracy and fraud by a fair preponderance of the evidence.[3]

---

[3] See infra, page 86.

On Reargument.

October 23, 1903.

**Summons—Publication—Affidavit.**

An affidavit for service by publication under G. S. 1894, § 5204, reciting that the subject of the action was personal property in this state, and that the defendants claim some interest therein, was sustained by a showing that there were involved shares of stock in a domestic corporation, represented by certificates, which had been surrendered to the corporation by defendants to be exchanged for certificates in a foreign corporation.

**Special Appearance—Appeal.**

Where nonresident defendants took part in the trial merely for the purpose of litigating the question as to whether the court had acquired jurisdiction by the service, they had no standing on appeal to attack the validity of the judgment in any other respect.

Separate appeals, one by nonresident defendants Lewis H. Eldridge, Samuel Kerr, Emma B. Fennimore, William J. Fraser and L. Morgan; the other, by defendant American Iron & Nickel Company, from a judgment of the district court for Hennepin county, entered pursuant to the findings and order of Simpson, J. Affirmed in part and reversed and new trial granted as to part, upon appeal of defendant American Iron & Nickel Company.

*Louis A. Reed, A. B. Jackson,* and *Robert J. Kerr,* for appellants.

*C. J. Rockwood* and *W. S. Dwinnell,* for respondent.

LEWIS, J.

This action was brought by the trustee of George W. Jenks, bankrupt, against the various defendants, for the purpose of having the plaintiff adjudged to be the owner of certain shares of capital stock in defendant the American Iron & Nickel Company (hereinafter called the "Nickel Company"), which are claimed to belong to defendant Jenks, but were fraudulently carried in his own name as trustee, and in the names of other parties.

All of the defendants, with the exception of Jenks and the Nickel Company, were nonresidents. Service of summons by publication was obtained on the nonresidents, who appeared specially, and objected to the jurisdiction of the court, and moved to set aside the service of summons. The motion was overruled, and the case pro-

ceeded to trial; the nonresident defendants having failed to answer to the merits. The court found that defendant Jenks was the owner of 418,917 shares of the capital stock of the Nickel Company, all of which stood in the name of the nonresident defendants. Judgment was entered decreeing the ownership of all of said stock to be in plaintiff, and directing the officers of the Nickel Company to issue new certificates of stock for the entire amount to plaintiff. Appeal was taken by the several defendants from the judgment so entered.

1. The record discloses the facts that Jenks had been adjudged a bankrupt September 5, 1899, at which time he owed an indebtedness amounting to more than $100,000; that Mr. Fowler, the plaintiff, was appointed trustee in bankruptcy September 25, 1899, and that proceedings were taken to ascertain whether or not the bankrupt did in fact own the stock which is now under consideration, but, no property having been discovered, the bankrupt was discharged in bankruptcy December 30, 1899, and his trustee was also discharged January 3, 1900. Afterwards, on April 21, 1900, a petition was made to the United States District Court for an order to reopen the proceedings and reinstate Mr. Fowler as trustee, and such order was made, directing the trustee to proceed as if the order of discharge had never been made. The petition for the reinstatement set forth that the bankrupt's schedule theretofore filed was untrue and incomplete, but that 10,000 shares of stock in the Nickel Company owned by the bankrupt had never been turned over to the petitioner as trustee, and the fact did not come to his knowledge until after the discharge. The petition also stated that there was a large amount of other personal property which had been concealed.

The present action was commenced in the following November, and the point is made that the trustee has no authority to maintain this action for the reasons: First, that he was not reappointed according to law; and, second, that the discharge of the bankrupt had the effect of also discharging his debts and obligations, and hence there are no creditors, and that the discharge in bankruptcy was a conclusive adjudication of all the matters now in controversy with reference to the ownership of the property in question, and that the property revested in the bankrupt absolutely.

Section 44 of the bankrupt act (Act July 1, 1898, c. 541, 30 St. 557

[3 U. S. Comp. St. 1901, 3438]) provides that in cases of a vacancy on the reopening of an estate, or after a discharge is revoked, the creditors of the bankrupt shall make a new appointment, and that if the creditors do not make such appointment the court shall do so. This section carries the power to revoke the order of the court closing the estate and discharging the bankrupt in any case where it can be shown that the estate has not been fully or properly administered. As between the creditors and the bankrupt, their relations have not necessarily been finally adjudicated by the order of discharge. The manner in which the closing of the estate may affect other parties is immaterial at this time. The act contemplates a full and complete administration of the estate, and in this instance the bankrupt cannot be heard to object to the proceedings in reopening, if fraud on his part was the occasion. Whether or not the subsequent purchasers of the stock are affected by the order will depend entirely upon whether they were purchasers in good faith for a valuable consideration. If they were not, they stand in no better position than the bankrupt himself; and, if they were, they are in no manner injured by the proceedings. It is clear that after the order was revoked, and the estate opened for further proceedings, the matter stood in the same relation before the court as it formerly did, and the trustee had authority to proceed to recover any property of the bankrupt that could be found.

It was held in Re Newton, 107 Fed. 429, 46 C. C. A. 399, that the court has no authority to appoint a trustee upon the reopening of an estate unless the creditors had failed to do so, but in that case the question was directly involved in an original proceeding brought for that purpose. In this case the creditors failed to act, and the court made the appointment direct upon the petition of the trustee. But this is a collateral action, and the appointment cannot be attacked herein. The court had jurisdiction of the subject-matter, and the appointment of a trustee was vested in the court upon certain conditions. A failure to comply with those conditions did not deprive the court of jurisdiction. The question is covered by Harvey v. Tyler, 2 Wall. 328; Lamprey v. Nudd, 29 N. H. 299. See also Culver v. Hardenbergh, 37 Minn. 225, 33 N. W. 792.

2. The record in this case is quite voluminous, and it has been no easy matter to trace the various certificates of stock in all their rami-

fications from the time of the original issue by the Nickel Company to the time the 290,000 shares were issued to the Chicago nonresident defendants. The Nickel Company was organized in February, 1896, with a capital stock of $1,000,000. It does not appear that at that time any tangible real or personal property was in contemplation by the promoters, and the purpose seems to have been to acquire some mineral property which was to be turned over to the company in consideration of the issue of stock. Defendant Jenks was the prime mover, and for several years the manager of the corporation; and in February, 1896, resolutions were passed naming Jenks the business manager, trustee, and financial adviser of the company, at such compensation as the board of directors might determine as right and equitable, and that, for the purpose of assisting the business manager and trustee in expediting real estate transactions, he was authorized and empowered to hold, buy, sell, convey, or mortgage any and all real estate for the company which he might, in his judgment, deem best, signing himself as trustee.

In the following April Jenks purchased in the name of a third party certain property, supposed to be mineral land, in Cook county, Minnesota, agreeing to pay therefor $41,000, of which $1,000 was paid in cash. Fifty-one per cent. of this property, and certain other property which had been purchased on contract, was sold by Jenks to the Johnson Nickel Mining Company, in consideration of which the Johnson Company agreed to pay the remainder of the purchase price above mentioned. A subsequent deal was made whereby the Nickel Company agreed to purchase from the Johnson Company the property, and to issue in payment thereof fifty-one per cent. of its entire capital stock, being 510,000 shares, and agreed to issue to Jenks the remaining forty-nine per cent., except such shares as had already been sold, which were 18,200. Certificates of stock were accordingly issued to Jenks for the amount of 471,800 shares, of which amount 280,000 remained in the name of Jenks, trustee, until March 8, 1900, and were then transferred to the defendant Eldridge.

The 510,000 shares of stock in the Nickel Company which had been issued to the Johnson Company, as above stated, or a large portion of it, were between October 27, 1897, and March 6, 1898, transferred to Jenks, trustee, in consideration of which the Johnson Company

was released from paying any more of the unpaid purchase price of the property. The effect of this deal was to relieve the Johnson Company entirely from the obligation, and the question arose as to whether the stock thus finding its way back to George W. Jenks was held by him in trust for the company in pursuance of the resolution, or whether it went to him in his individual capacity, and the word "trustee" was used as a cover to prevent his creditors from knowing the true situation. Afterwards, in March, 1898, 242,394 shares of the stock standing in the name of Jenks, trustee, were transferred to defendant Eldridge.

At the time the petition in bankruptcy was filed, certificates aggregating 334,428 shares stood in the name of Jenks, trustee, on the books of the Nickel Company. In making up his schedule for the bankrupt court, Jenks omitted to include any of this stock, with the exception of 9,410 shares, stating its value to be $4,570, and that the same was pledged for an indebtedness of that amount. From December, 1899, to March, 1900, Jenks sold 20,370 shares of stock standing in the name of Eldridge to a Mr. Ralston, of Chicago, at fifty cents on the dollar, and the money was used to pay off the unpaid balance of the purchase price of the property which had been reconveyed by the Johnson Company to the Nickel Company. The court found that the nonresident defendants conspired together for the fraudulent purpose of cheating the creditors of Jenks, and that 290,000 shares of the stock had been conveyed to them without any consideration, and also found that 53,917 shares then standing upon the books of the company in the name of defendant Eldridge were in fact the property of Jenks.

We have followed the evidence carefully through the record, and are quite well satisfied that the court was correct in holding that Jenks never held any of the stock as the trustee for the Nickel Company. His position as manager, the manner in which the business was conducted, the method employed to purchase the property, and causing it to be transferred to the company in consideration of the issue of stock, the receipts and transfers in connection therewith, all indicate that Jenks was acting individually in taking the stock from the Nickel Company and the Johnson Company, and that the Nickel Company had no interest in it whatever. It is also quite clear that defendant Eldridge was not a bona fide holder, for value, of any of

the stock standing in his name from time to time. This man lived in Massachusetts, and was related to Jenks by marriage. There was no evidence that he ever paid anything for the stock, and, according to Jenks' testimony, the only consideration for its transfer was an agreement by which Eldridge was to take care of Jenks' son, and an agreement to pay him something at some future time. The fact that large blocks of stock were issued in the name of Eldridge from time to time, and that Jenks held a power of attorney from Eldridge, all indicate that the name was used simply for the purpose of covering up the true transaction, and the finding of the court in this respect cannot be molested.

But a much more serious question is met when we come to analyze the evidence to connect the other nonresident defendants with the conspiracy to defraud. Giving plaintiff the benefit of the most favorable view, we are unable to discover any other proof that these parties were not bona fide purchasers for value, than the following circumstances: Kerr was a Chicago attorney who had acted as Jenks' attorney in the organization of the North American Iron Company, a New Jersey corporation. Chaffee had acted as his physician, and the other defendants were known to Jenks and Kerr. The certificates were transferred to these nonresident defendants April 30, 1900, and the petition for the reopening of the estate and the reappointment of the plaintiff as trustee had been made April 21. On March 27 resolutions were passed by the stockholders authorizing the conveyance of all of the property and assets of the Nickel Company to the New Jersey company in consideration of the issue of 882,475 shares of stock, to be distributed to the stockholders of the Nickel Company, share for share, as a final dividend. Similar resolutions were passed the same day by the directors of the company. It seems that, before these meetings were held, the attorney for plaintiff informed Ralston and Holt, the president and the attorney of the New Jersey company, that the stock standing in the name of Eldridge or Jenks, trustee, belonged in fact to Jenks personally, and would be claimed by his creditors.

As before stated, the stock was not issued to the nonresident defendants until April 30. In pursuance of the resolution to transfer its property to the New Jersey company for stock of like amount, and

90 M.—6

at the time of the commencement of this action those orders were outstanding. The nonresident defendants, among others, having surrendered their stock, received the orders. The further fact is to be noted that Jenks acted for the nonresident defendants in causing their stock to be transferred to them, and in holding and surrendering it to the company. These are the facts relied on to show fraud. On the other hand, there is the positive statement of Jenks, whose testimony was taken at a previous hearing before the bankrupt court, and read at the trial on behalf of plaintiff, that the stock had been sold to the nonresident defendants in Chicago. And it appears that, at the time so testified to by Jenks, there was nothing pending in the United States court to indicate that any question was raised as to the ownership of the stock purchased. Notice to Ralston and Holt was not notice to defendants.

In the face of this evidence, we are unable to see how plaintiff made out a case of conspiracy and fraud against the Chicago nonresident defendants. They do not appear at all in the transaction until the stock was sold to them in Chicago through Kerr, according to Jenks' testimony, and his statement must be taken as entitled to weight, and it was introduced on the part of plaintiff. The fact that those defendants forwarded their stock to Jenks, at Minneapolis, for the purpose of having it transferred upon the books or surrendered to the company, does not of itself stamp the act as fraudulent, or hold the parties open to the imputation that they were aiding and abetting Jenks in covering up his stock. It may be that those parties were figureheads used to assist Jenks in carrying out his scheme, but the conclusion cannot be based upon mere conjecture. Because Jenks systematically pursued a scheme from the very beginning to conceal his property from his creditors does not warrant the court in holding that every person with whom he dealt must have been cognizant of his purposes, and had no connection with him or the stock except to advance the fraud. Upon this branch of the case, the evidence does not support the finding of fact marked "X¾."

3. It is also found by the court that in July, 1896, Jenks surrendered, without any consideration, and for the purpose of delaying and defrauding his creditors, 50,000 shares of the capital stock, and in April, 1900, he and Eldridge, without any consideration, and for the same

purpose, surrendered to the company 25,000 shares of the capital stock which had theretofore stood in the name of Jenks and Eldridge, and which in fact belonged to Jenks; and it was adjudged that the company reissue to the plaintiff the amount of stock thus surrendered. The evidence is sufficient to justify the court in holding that the 75,000 shares thus returned to the company was personal stock of defendant Jenks, but, in order to support the conclusion that it should be reissued by the company for the benefit of the creditors of Jenks, the following objections must be disposed of: Conceding that it was stock belonging to Jenks, and that it had some value, we are unable to find any evidence to connect the other officers, directors, and stockholders of the Nickel Company with any scheme or plan to aid Jenks in thus concealing his property. Three of the directors testified, and disclaimed that the company had any interest in the stock standing in the name of Jenks, trustee, but there is nothing to indicate with what purpose the surrender was made, except the fact of the transfer on the books. In the one instance, a $100,000 certificate was surrendered, and a $50,000 taken in its stead; and in the other, a $50,000 certificate was surrendered for a $25,000 certificate. No explanation is made of these certificates, but Jenks was not personally a witness at the trial, and the officers of the company did not explain. The finding of the court seems to rest upon the mere fact of the surrender of the larger certificates, and the taking in their place certificates for a less amount.

We think that plaintiff was called upon to furnish at least some evidence from which the fraudulent intent on the part of the company, as well as on the part of Jenks, may reasonably be inferred. That the stock, when surrendered, belonged to Jenks, is not sufficient. There may have been a good consideration running from the company. The stock may have been surrendered by Jenks for the benefit of the other stockholders. Subsequent stockholders may have acquired their stock, or an interest in the company, with reference to the acquisition by the company of the 75,000 shares. The fair inference from the retention of the same by the company is that the certificates were received by it in a lawful, and not illegal, manner; and this presumption is not overcome by the fact that the stock belonged to Jenks at the time it was surrendered, and that he was generally engaged in fraudulent practices regarding other stock belonging to him. For

these reasons, the finding of the court XV is not sustained by the evidence.

4. The 53,500 shares of stock found standing in the name of the defendant Eldridge had been surrendered to the Nickel Company by Jenks, and orders for a like amount upon the New Jersey company had been issued by the Nickel Company and delivered to him. The question arises whether, under such circumstances, the court had the power to adjudge that those shares of stock should be reissued to plaintiff by the Nickel Company. It would seem that the trial court disposed of the question upon the theory that the act of the Nickel Company in transferring its property to the New Jersey company was void, that the outstanding orders were of no effect, and that the company stood in the same relation to the stockholders as though such proceeding had never taken place. In the absence of proof that the Nickel Company, its officers and other stockholders, and the New Jersey company, caused the property to be sold for the purpose of carrying out the fraudulent scheme of Jenks to dispose of his stock, the holding of the trial court that the transfer was void cannot be sustained. If such parties, in good faith, at a duly called meeting of the stockholders, sold and transferred all of its property to the New Jersey company in consideration of the delivery to the stockholders of the Nickel Company of the same amount of stock in the New Jersey company, we are unable to see how in this proceeding such action can be attacked. The validity of that transfer can only be determined in an action wherein all of the parties interested are before the court, including the New Jersey company. The evidence is not sufficient to warrant a holding that the Nickel Company, and the stockholders and directors other than Jenks, were engaged in the fraudulent scheme of concealing the ownership of his stock; and there is no evidence whatever connecting the New Jersey company, its officers and stockholders, with such scheme. Moreover, the New Jersey company is not a party to this action, the purpose of which was not to attack such sale and transfer. It necessarily follows that the judgment requiring the Nickel Company to reissue the stock must, to be sustained, rest upon some other basis than the illegality of the sale and transfer of its property by the Nickel Company to the New Jersey company.

However, for the purposes of this case, it is not important whether

the Nickel Company lawfully sold and conveyed its property to the New Jersey company, and in pursuance thereof caused its stockholders to surrender their stock and take orders upon the New Jersey company for a like amount, for the legal effect of the decision of the trial court is that, whatever interest defendant Jenks had in and to the 53,500 shares of stock standing in the name of Eldridge, such stock in fact belonged to the plaintiff, his trustee in bankruptcy, and that, whatever position Jenks occupied with relation to the company and the other stockholders by virtue of such stock, the plaintiff must necessarily succeed thereto. So far as the stockholders and officers of the Nickel Company are concerned (and the same with reference to the New Jersey company), plaintiff trustee would acquire no greater rights than were possessed by the bankrupt. In other words, the plaintiff assumes the position of the bankrupt with respect to the stock in its new relation, charged with the same burdens and obligations, as well as the same rights and privileges, as the bankrupt possessed. If this be true, then it does not matter that the judgment of the court went further than was necessary, and required the Nickel Company to reissue the shares of stock in the name of the plaintiff, for, if that part of the judgment be complied with, it amounts to no more than to place the plaintiff in possession of the evidence of the interest in the company to which he succeeded. It neither affirms nor denies the validity of the transfer of its property from the Nickel Company to the New Jersey company. It neither approves nor repudiates the former surrender of the stock, and the taking of the orders in the name of Jenks. It will be a matter for the plaintiff to determine what course he shall pursue. If he concludes to accept the equivalent amount of stock due from the New Jersey company, if so advised, he may apply to have the judgment modified to that extent, or he may repudiate such sale, and by a proper action test its validity.

5. The answers of the nonresident defendants amounted to no more than affidavits in supporting their motion to dismiss the action because of insufficient service. There was no general appearance, and no answer to the merits. Constructive service by publication was sufficient, but the plaintiff was not relieved from supporting the allegations of the complaint by evidence fairly tending to support the charge of fraud and conspiracy.

The judgment is affirmed as to the ownership of the 53,500 shares of stock standing in the name of defendant Eldridge, evidenced by certificates Nos. 1449, 1450, 1468, and 1486, and as to the other nonresident defendants the judgment is reversed and a new trial granted.

On October 23, 1903, after reargument the following opinion was filed:

LEWIS, J.

In the former opinion the court fell into the error of assuming that the cause was tried on the merits as to nonresidents, and it was stated that plaintiff was not relieved from the burden of proof in supporting the allegations of the complaint. Upon reargument that question has been cleared up by the admissions of both parties. There was no appearance by the nonresident defendants, except specially to test the question of the jurisdiction, and their appeal to this court raises no other question. If the trial court was correct in holding that jurisdiction was acquired as to such defendants, then under the pleadings they have no standing in this court to test the validity of the judgment appealed from; hence what was said in the former opinion concerning the burden of proof of such defendants was not within the issues of the case, and is withdrawn.

In the former decision it was held that service by publication was sufficient, but because it was assumed that the case proceeded to trial upon the merits notwithstanding there was no answer, that branch of the case was not discussed. Service was obtained against the nonresidents by publication under the fifth subdivision of G. S. 1894, § 5204, and the affidavit recited that the subject of the action was personal property in this state, and that the defendants claimed some interest therein, etc. At the date of the execution of the affidavit, certificates representing all of the shares of stock, except 20,000 held by the nonresident defendants, had been surrendered to the Nickel Company to be exchanged for certificates in the New Jersey company, and before the trial in the court below all of such stock had been surrendered for such purpose. The Nickel Company was a Minnesota corporation, with its office and place of business in the state of Minnesota. The property interests in the corporation consisted of the shares of stock,

and the certificates were merely evidence of the ownership of such interests. Shares of stock are property, and are subject to seizure by attachment or upon execution under the provisions of our statutes (section 5293). Jellenik v. Huron Copper Mining Co., 177 U. S. 1, 20 Sup. Ct. 559. The fact that the certificates had been surrendered to be exchanged for others in the New Jersey company, did not change the nature of the property interest. The actual transfer had not been completed, and the Minnesota corporation was still in existence.

The finding of the court to the effect that the subject of the action is personal property situated in the state, and that the relief asked for consists in excluding the defendants from any interest therein, and the court had jurisdiction of the subject of the action, is sustained by the evidence. The nonresident defendants took part in the trial merely for the purpose of litigating that particular question. It follows that they have no standing on this appeal to attack the validity of the judgment in any other respect. In going to trial upon the one issue of jurisdiction, they surrendered all right to raise any question as to the decision of the court in other respects, and for this reason the judgment appealed from is affirmed as to defendant Chaffee, who made no appearance; and upon the appeal of defendants Lewis H. Eldridge, Samuel Kerr, Emma B. Fennimore, William J. Fraser, and L. Morgan the judgment is affirmed; and upon the appeal of the defendant the American Iron & Nickel Company the judgment is affirmed as to 343,417 shares, evidenced by the following certificates, viz.: Nos. 1,532, 1,533, 1,534, 1,535, and 1,536, in the name of Fred F. Chaffee; No. 1,537, in the name of Samuel Kerr; No. 1,538, in the name of L. Morgan; No. 1,541, in the name of William L. Fraser; No. 1,542, in the name of Emma B. Fennimore; Nos. 1,449, 1,450, 1,468, and 1,486, in the name of Lewis H. Eldridge; and No. 192, in the name of George W. Jenks—and as to the remaining 75,000 shares, not represented by certificates, judgment is reversed, and new trial ordered.